Mrs. Pauline LAINO, Petitioner,

v.

SECRETARY OF DEFENSE, Secretary of the Department of the Army, Major General Gines Perez, Commanding General, Fort Jackson United States Army Training Center, Respondents.

Civ. A. No. 68-825.

United States District Court
D. South Carolina,
Columbia Division.

Nov. 1, 1968.

Frank Giordani, Columbia, S. C., for petitioner.

Klyde Robinson, U. S. Atty., Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., for respondents.

ORDER

SIMONS, District Judge.

This matter is before the court upon the petition for writ of habeas corpus of Mrs. Pauline Laino on behalf of her minor son Hector Laino, a selective service inductee into the United States Army from Brooklyn, New York, who is presently stationed at Fort Jackson Military Reservation, Columbia, South Carolina and is currently confined to the Fort's stockade for his refusal to engage in the Army inductee training program upon the ground that he is physically unfit and unable to do so.

The petition alleges in substance as follows: That Hector Laino was duly registered with his local selective service board in Brooklyn, New York and that such board erred in finding him physically fit for military service because of a

previous history of rheumatic fever; that he was formally inducted into the United States Army about July 25, 1968 and was thereafter transported to the Fort Jackson Military Reservation for training whereupon it soon developed that the after effects from his seige of rheumatic fever rendered him physically unable to maintain his place with fellow trainees and that such training "would have severe and possibly fatal effects upon him;" further that petitioner and her son have limited formal education and experience great difficulty in communicating effectively in the English language and consequently failed to understand their right of appeal to the selective service board for reclassification because of his physical disability; that they relied upon the opinion of their family physician who advised that Hector Laino would not be drafted because of his physical disability and medical history. The petition further alleges that during the year 1962 Hector Laino was stricken with rheumatic fever, that he developed an allergy to penicillin, and since that illness has been continuously under medication on a twice daily basis "to prevent a fatal recurrence of the disease;" that petitioner is informed by competent medical authority that Gantrisin, the sulphur drug which he has been and is now taking is effective in a civilian environment but that such medication is not effective against "a sulfonamide-resistent strain of Beta-Hemolytic Streptococci Bacteria," which has emerged in personnel of the United States Army. Petitioner further contends that through her attorney she applied for a medical review board on behalf of her son which has been refused; and that therefore she and her attorney have exhausted all their administrative procedures; that her son is presently confined to the stockade at Fort Jackson without receiving the necessary amount of medication, that he is physically unable to meet the physical exertions necessary to his training as an army inductee, and that she is informed and believes that if "action is not immediately taken that irreparable physical harm may be caused petitioner's son, and that his very life is thereby placed in jeopardy without due process of law." Petitioner prays that the court issue a writ of habeas corpus against the respondents herein for the purpose of inquiring into the cause of the restraint and detention of petitioner's son, and for such other and further relief as may be proper in the premises.

Petitioner's petition is supported by attached affidavits of herself and her attorney, Frank Giordani, which generally substantiate and support the allegations of her petition.

Pursuant to receipt and consideration of petitioner's petition the court issued its order to show cause to respondents which was filed September 23, 1968 requiring them within fifteen days after service upon them to show cause why the prayer of the petition should not be granted.

Under date of October 7, 1968 respondents filed their return which had attached thereto a copy of all available medical records pertaining to Hector Laino, including the hospital records of The Jewish Hospital of New York where he was confined and treated during his 1962 seige of rheumatic fever, also a copy of Laino's preinduction physical examination conducted November 28, 1967 at the Armed Forces Entrance and Examining Station, Fort Hamilton, Brooklyn, N. Y., and also all medical records concerning Laino since his arrival at Fort Jackson, including a report of medical examination of the medical board dated September 27, 1968 composed of Dr. Thomas S. Caras, Major, Medical Corps, United States Army, as president, and with Drs. Joel S. Koslow and Herbert M. Fischer, both Captains in the Medical Corps, U. S. Army, as the other two members. Also attached is a copy of the report of Dr. Warren Irvin, an outstanding cardiologist engaged in private practice in Columbia, S. C., who serves as a cardiology consultant for the United States Army.

Respondents' return alleges that Hector Laino's induction into the United

States Army by his local selective service board in Brooklyn was regular and proper in every respect, and pursuant to a proper armed forces physical examination in accordance with 32 C.F.R. 1628.10 which provides as follows:

"Every registrant, before he is ordered to report for induction, or ordered to perform civilian work contributing to the maintenance of the national health, safety, or interest, shall be given an armed forces physical examination under the provisions of this part, except that a registrant who is delinquent and a registrant who has volunteered for induction may be ordered to report for induction without being given an armed forces physical examination."

The return further alleges that Laino was found medically qualified for induction, and that thereafter he was ordered by his local board to report for military service, and was inducted in accordance with 32 C.F.R. 1631.7 which provides as follows:

"Each local board, upon receiving a Notice of Call on Local Board (SSS Form No. 201) from the State Director of Selective Service (1) for a specified number of men to be delivered for induction or (2) for a specified number of men in a medical, dental, or allied specialist category to be delivered for induction, shall select and order to report for induction the number of men required to fill the call from among its registrants who have been classified in Class I–A and Class I–A–O and have been found acceptable for service in the Armed Forces * * * "

Respondents' return acknowledges that Laino had an attack of rheumatic fever during 1962, and that the Army was well aware of this previous history at the time of his pre-induction physical examination and after his military service began. It further alleges that the medical records incorporated in the return show conclusively that Laino has no residual heart disease and is fully qualified for military service. It is further alleged that his service in the army is not calculated to expose him unduly to any streptococcal infections and rheumatic fever, that he will be continued on the Gantricin prophylaxis while he remains in the service, and that he is actually better off while he remains in the service because of the Army's stringent control and guard against such infections. The return further asserts that a medical board has been convened and that Laino has been examined by an Army rheumatologist and Army cardiologist as well as by Dr. Warren Irvin, Jr., a civilian cardiologist, all of whom are in total agreement that Laino has no evidence of rheumatic heart disease, but that his symptoms are related to a cardiac neurosis which he has suffered as a result of over-protection and undue physical restriction; and that the medical board found him fit for military duty.

As a second defense respondents assert that petitioner's petition fails to state a claim upon which relief can be granted and that the court lacks jurisdiction over the person and the subject matter; that petitioner is apparently seeking a medical review board determination which has already been accomplished, and that if petitioner is seeking a discharge this court has no jurisdiction to grant same since the only inquiry this court has jurisdiction to make is whether there is a basis in fact for the Army's determination that Laino was and is fit for military service. Respondents pray that the petition be dismissed with costs.

After a careful and thorough review of the entire record, including all of the medical records and correspondence included in the attachments to respondents' return, the court has concluded that an evidentiary hearing is not indicated or required, and that this matter should be disposed of upon the present record before the court.

Petitioner does not question the authority or the procedures used by the local selective service board in inducting her son into the military service, and she further admits that they failed to appeal from the findings of the preinduction physical examination and his I–A classification, since they are of limited educa-

tion, because of their inability to communicate properly in the English language, and their reliance upon their local doctor who advised them that her son would not be inducted because of his physical condition.

■ The court concludes that this matter is properly before the court since habeas corpus is a proper remedy if Laino was illegally or wrongfully inducted into, or is being illegally retained in, the armed forces. United States ex rel. Lipsitz v. Perez, 260 F.Supp. 435 (D.C. S.C.1966).

The primary issues before the court are whether Laino was properly classified as being physically fit and inducted by his selective service board into the military service, and whether he is now physically and mentally qualified to be retained in the service.

■ The jurisdiction and scope of a review of this type by the court is very limited. The general principles governing the court's authority and responsibility in this connection are set forth in the following cases: In Roberson v. United States, 208 F.2d 166 (10th Cir. 1953) the court said:

"It is not the province of the court or jury to weigh the evidence on which the local board classified the registrant. The judicial inquiry is limited to the question whether there is any factual basis for the classification."

Also the Eighth Circuit in DeRemer v. United States, 340 F.2d 712 (1965) declared:

"Since the inception of the Selective Service System the various classification procedures have, time and again, been considered by the courts, including the procedures surrounding conscientious objector claims, and certain guidelines for judicial review have merged from these cases. The scope of review is 'the narrowest known to the law.' Blalock v. United States, 247 F.2d 615, 619 (4 Cir. 1957). The courts will interfere with a classification only if there is a lack of basic procedural fairness or if there is no basis in fact for the classification." (Citations omitted).

Thus any review by this court is limited to a determination as to whether the selective service board had a basis in fact for its classification of Laino and its determination that he was physically fit for induction into the armed services. United States v. Stewart, 322 F.2d 592 (4th Cir. 1963); United States v. Dicks, 392 F.2d 524 (4th Cir. 1968). Further the burden is upon the registrant to establish his eligibility for deferment or exemption from military training or service to the satisfaction of the local board. Classification is an essential step in the process of induction into the armed services, and unless an appeal is taken to a selective service appeal board a local board's decision on a registrant's claim is final. Olguin v. United States, 392 F.2d 329 (10th Cir. 1968). As was stated in *Olguin:*

"The courts cannot review the correctness of a board's action if there is any evidence or 'basis in fact' to support the decision of the board. * * *

"The board's action may be set aside if there is evidence that it was arbitrary and capricious, based upon bias or prejudice, or that the registrant was denied a procedural right and such denial was actually prejudicial to his substantial rights. * * *" (Citations omitted).

A review of the record here in the light of the foregoing legal principles reveals no contention on the part of petitioner that the local selective service board's actions in finding her son physically qualified and inducting him into the service were arbitrary or capricious, or based upon bias or prejudice, or that he was denied procedural due process. The essence of her contention is that the board's finding her son physically fit for military service was not factually supported.

■ On the record the court finds and concludes that there was ample and substantial factual bases upon which the local selective service board classified Laino I–A, found him to be physically

fit for military service, and in the absence of any appeal therefrom inducted him as a draftee in the United States Army in accordance with 32 C.F.R. 1628.10 and 32 C.F.R. 1631.7.[1]

Having reached such a conclusion the court would be warranted in dismissing petitioner's petition without further consideration. However, in view of the medical report in the record from Sidney Tamse, M.D., 902 Montgomery Street, Brooklyn, New York, dated August 17, 1968,[2] and other correspondence [3] including that from Congressman Santiago Polanco Abreu of San Juan, Puerto Rico wherein he advised the Army under date of August 30, 1968 that petitioner had requested his assistance in obtaining a medical evaluation of her son to determine if he meets the medical standards for the military service and that she also requested a psychiatric evaluation, the court feels compelled to review and determine whether or not the record substantiates factually the Army's present determination that Laino is physically qualified for military service.

█ In view of Dr. Tamse's report of August 17, 1968 (Note 2, supra), the court can readily understand petitioner's concern for the welfare of her son and her desire to have a medical determination that he is physically fit for military service. Of course if Laino's health or his life are seriously endangered by continuing military service as opined by Dr. Tamse, Laino should be released from military service. On the other hand if he is physically qualified to serve, he has an obligation and responsibility as an American citizen to do so, along with the other countless thousands of America's finest youths who are either being inducted or volunteering for service in the United States military forces during this critical time in our history.

The record herein reflects that prior to the convening of the medical board at Fort Jackson on September 27, 1968 the

1. Attention is invited to the report of medical examination of Hector Laino which was his armed forces or pre-induction physical examination, copies of which are contained in the attached medical records, given at Ft. Hamilton, Brooklyn, N. Y., on November 28, 1967 determining that he was physically qualified for service. It is further noted that the examining authorities had notice of his prior history of an attack of rheumatic fever.

2. The letter from Dr. Sidney Tamse reads as follows:
"Re: Hector Laino   8–17–68
    444 Park Ave.
    Brooklyn, N. Y.
"To Whom It May Concern:
"Hector has a definite history of having had Rheumatic Heart Disease for which he was treated in the Brooklyn Jewish Hospital in May 1967.
"Present examination reveals a definite systolic murmur over the heart which is definite proof of valvular damage.
"I have treated him for the past ten years. I can definitely say he would be very susceptible to acquiring another Rheumatic Fever with Cardiosis infection. This would cause increased damage to his already damaged heart. This would place his very life in jeopardy. I can also state that full army duty would tax

his heart beyond its capacity and lead to decompensation and even death.
"Hector should lead a restricted life away from large groups of people. Any streptococcus infection, acquired among big groups of people, could lead to another bout of Rheumatic Heart Disease and due consequences.
"I definitely do not consider him fit for military service.
        "Yours truly,
        s/ Sidney Tamse, M.D."

3. The attached enclosures also contain a letter from R. Stedman Sloan, Jr., an associate of R. K. Wise, Esquire, an attorney of Columbia, S. C., to Senator Jacob K. Javits dated August 29, 1968 in which he advises that petitioner sought assistance from his office for her son Hector Laino asserting that his physical condition is deteriorating and that the Army has refused to give him physical examinations to determine whether the diagnosis by his civilian doctor in Brooklyn (Dr. Tamse) is accurate. He seeks Senator Javits' assistance in obtaining a medical examination of Laino and he further advises the Senator that "should a thorough medical examination disclose that her son is fit for military duty and that such will not threaten his heart, then she will abide by the result."

Medical Corps of the United States Army at Fort Jackson had evaluated Laino physically and psychiatrically and had determined that he was qualified for military service. On August 29, 1968 Colonel Robert S. Lockwood, Commanding Officer of the United States Army Hospital at Fort Jackson wrote petitioner as follows:

"Dear Mrs. Laino:

"This is in response to your letter concerning your son, Private Hector M. Laino, US 67 194 982.

"Hector has been evaluated by a well trained diagnostician as well as a cardiologist, this hospital. It is fully recognized that your son had rheumatic fever during childhood. Present examinations, however, are entirely normal and there is no evidence of heart disease at this time. He has no condition at this time which would warrant separation from the service for medical reasons. He will be maintained of [sic] prophylactic medication (Gantricin) during his military service.

"Your concern regarding your son's health and well being is understandable, and I should like to reassure you that excellent medical facilities are available to him at all times should the need arise.

"Sincerely yours,
"ROBERT S. LOCKWOOD
Colonel, Medical Corps
Commanding"

A report from Dr. Louis N. Gruber, Captain, U. S. Army Medical Corps, a psychiatrist, dated September 24, 1968, contains the following mental status diagnosis and recommendations:

"2. MENTAL STATUS: This is a slightly built Puerto Rican male in stockade uniform who comes to interview readily. His manner is somewhat infantile and he appears younger than his stated age. He was cooperative and readily answered all questions. He seemed to have very little insight into the significance of his behavior. Mood was one of mild anxiety and depression, and affect was appropriate. His thought processes were orderly and there was no evidence of psychotic thinking. Sensorium was clear and intelligence appeared to be in the average range. The patient related a long history of being rather closely tied to his mother with very limited social relationships outside the family. He described his ambition to be a preacher after leaving the service, but his conception of this was rather vague and unrealistic.

"3. DIAGNOSIS: (3213) Immature personality, chronic, moderate; manifested by social isolation, infantile preoccupation, extreme dependency, and inability to tolerate frustration. STRESS: Routine military service. PREDISPOSITION: Lifelong personality pattern. LOD, NO, EPTS.

"4. RECOMMENDATION: Subject is cleared for any administrative action deemed appropriate by command decision. Psychiatric disability should not interfere with performance of routine military duties."

A narrative report of the physical examination, diagnosis, and findings of the medical board composed of Major Caras as president and Captains Koslow and Fischer as members dated September 27, 1968 is as follows:

"*MILITARY HISTORY:* EM entered active duty on 25 July 1968.

"*SOCIAL AND FAMILY HISTORY:* The patient has one brother who has asthma. One sister may have had rheumatic fever; however, her murmur was first heard in early childhood and may be of congenital origin. One brother is in the Military Police.

"*PAST HISTORY AND REVIEW OF SYSTEMS:* unremarkable except as related in HPI.

"*HISTORY OF PRESENT ILLNESS:* This 19 year old Puerto Rican male, who has lived in New York since early childhood, was well until the age of 13 years when he developed classical rheumatic fever with migratory polyarthritis and fever. He was admitted to the Jewish

Hospital of Brooklyn on 7 April 1962. During initial evaluation he was found to have a systolic murmur, but there was no evidence of cardiac enlargement, diastolic murmur or thrill. An EKG at that time allegedly revealed a prolonged PR interval and some ST depression suggestive of carditis. ASO titer was reported as 2500. He was placed on aspirin and basically had an uncomplicated course, but was placed on Penicillin. Prior to this episode he had had a URI for which he was treated with Penicillin. It was several weeks after this episode that his rheumatic fever occurred. While in the hospital, on Penicillin, he developed a rash and was switched to sulfa, which he has continued ever since. His civilian records from the Jewish Hospital in New York were reviewed and did not reveal any further evidence of valvular disease, with repeat x-rays showing no cardiac enlargement. The patient's activity was considerably restricted. Two years later he quit school, working at light jobs.

"He complains of dyspnea on exertion, vague musculoskeletal pains, and grabbing chest pain and backache, especially on lifting relatively heavy objects. The patient has not participated in sports to any extent.

"The patient was inducted into the Army on 25 July 1968. His family has instituted request for medical separation because of his history of rheumatic fever. A letter from his civilian physician indicated the history of rheumatic fever and the physician's opinion that the patient was not fit for military duty.

"The patient was referred to the Medical Clinic for evaluation. He was examined by the rheumatologist who found no evidence of rheumatic heart disease; it was his recommendation that the patient should be continued on sulfa prophylaxis. The patient was also seen by the civilian consultant cardiologist who also found no objective evidence of rheumatic heart disease at this time and who felt that physical activity would be beneficial for this individual.

"PHYSICAL EXAMINATION: Blood pressure 120/80, both arms. Pulse 80 and regular. The patient was a well developed and well nourished Puerto Rican male. Head and neck examination was normal. The neck was supple; there was no neck vein distention. The lungs were clear to percussion and auscultation. Examination of the heart revealed the PMI in the 5th left intercostal space at the mid clavicular line; there was no heave or thrill; rhythm was regular; P-2 was louder than A-2 with physiologic variation with respiration. There were no gallops. The mitral first sound and the pulmonic 2nd sound were thought to be of normal intensity. There was a Grade 1/VI systolic ejection murmur in the pulmonic area. Exercise did not augment this murmur or produce any gallops. The abdomen was soft and nontender, without visceronmegaly. Peripheral pulses were intact. The remainder of the examination was unremarkable.

"LABORATORY AND X-RAY DATA: EKG revealed axis of 70 degrees, with normal PR interval; tracing entirely normal. Chest x-ray and cardiac series revealed a normal sized heart with normal bronchovascular markings, and no cardiac calcification or chamber enlargement.

"PRESENT CONDITION: This patient is status-post rheumatic fever 6 years ago, with no objective evidence of rheumatic heart disease. It is felt that the patient is fit for full duty, without restriction, other than the continuance of sulfa, ½ gram Bid, and treatment with Erythromycin for any Beta Strep infections (he is allergic to Penicillin).

"The patient refused to participate in training which led to his confinement in the stockade. He was given psychiatric evaluation and it was felt that he had an immature personality, but that his psychiatric disability should not interfere with his performance of routine military duty.

"DIAGNOSIS: 1. YO39: Status, post rheumatic fever approximately 6 years ago; no objective evidence of

rheumatic heart disease, normal sized heart and normal sinus rhythm. LD NO EPTS

2. 3213: Immature personality, chronic, moderate; manifested by social isolation, infantile preoccupation, extreme dependency, and inability to tolerate frustration. Stress: Routine military service. Predisposition: lifelong personality pattern. LDNO EPTS"

The recommendation of the medical board, concurred in by Col. Robert S. Lockwood, Commanding Officer of the U. S. Army Hospital at Ft. Jackson, was as follows: "Return to full duty without profile limitation (continue on Gantrisin prophylaxis)."

In addition to the Army specialists who have recently examined Laino and found him fully qualified for military service as set forth above, Laino was examined in consultation by Dr. C. Warren Irvin, Jr., a civilian practitioner of Columbia who is known to the court as one of the leading cardiologists in South Carolina and the nation. Dr. Irvin's consultation report, including his examination, impression and recommendations, is as follows:

"This 19-year old male, a [sic] Puerto Rican extraction is seen today for the Army because of the problem of rheumatic heart disease subsequent to bonafide attack of rheumatic fever some six years ago. His records are reviewed with Dr. Caras and it is clearly evident that about six years ago he had what appears to be a very mild episode of rheumatic fever without significant valvulitis or residual damage. He is now in the Army and he is functioning very poorly for many reasons, but these cloud the issue a great deal in making it impossible to get an adequate history from him. He is now presently in the stockade because he has refused to obey orders. He indicates that he can do really very little physically without getting a grabbing sensation in his chest, shooting pains over his chest and gets short of breath with any sort of exertion. All of this is very non-specific and there are no symptoms to really suggest heart disease. It was felt unnecessary in view of the detailed records to pursue any further history taking at this time.

"*Examination:* Blood pressure is 115/80 in both arms. He is a tall, thin, dark skinned—young male who speaks with a Spanish accent. There are no other skin lesions. The head, eyes, ears, nose and throat were not examined. Neck: Venous pressure was clearly normal. The pulse wave is normal. Chest: There is the chest that is somewhat thin. The lungs fields are entirely normal and clear. The heart is not enlarged. PMI is easily felt within the mid-clavicular line of a normal tapping character. There is no evidence of any ventricular enlargement to palpation. The rhythm is regular, except for some sinus arrhythmia and is moderately rapid. The first sound is normal. There is a very faint systolic murmur which is heard louder recumbent than sitting up. This murmur is high-pitched, soft and blowing and clearly of a functional type. It varies with respiration and it is of no consequence. The sound is normally split. There is no gallop sound. There is no other abnormality noted. There is no diastolic sound. The liver is not palpable. The femoral pulses are normal.

"*Electrocardiogram* showed a PR interval approximately .18 seconds. There is some early repolarization of the ST segments which is clearly normal and the tracing is entirely normal.

"*X-rays of the chest:* They were reviewed which include multiple views with barium in the esophagus. The heart is entirely normal on these views. There is no evidence of atrial enlargement or any intracardiac calcification. The lung fields are clear.

"*Impression:* (1) History of rheumatic fever of approximately six years ago without evidence of rheumatic heart disease at this time.

"*Recommendations:* On reviewing the letters from the doctors, etc. I must say that I dis-agree with his civilian physician's recommendations in regards to his

prognosis and his care. Exercise would be of benefit to this boy and certainly not a detriment. As far as his career in the Army is concerned, I do not feel that he would be any more exposed to strep-tococcal infections than he would be otherwise and I am not particularly concerned about the possibility of him developing another attack of rheumatic fever in view of his history of Penicillin allergy. He of course should continue taking Gantrisin as he is now doing twice a day."

From the foregoing it is shown conclusively that Laino is fully qualified physically and psychiatrically for military service in the United States Army; the only restriction is that he should continue to take the Gantrisin prophylatic twice daily, and the Army has assured that this medication will be made available to him during his military service.

In accordance with the foregoing findings and conclusions petitioner's petition is dismissed.

And it is so ordered.